UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| COREY PRESTON, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 2:13-cv-137-WTL-WGH ) |
| DR. O'BRIEN, | ) ) |
| Defendant. | ) |

**Entry Discussing Motion for Summary Judgment**

Plaintiff Corey Preston, a former inmate of the Putnamville Correctional Facility ("Putnamville"), brings this action pursuant to 42 U.S.C. § 1983, alleging that the defendant Dr. O'Brien violated his right to constitutionally adequate medical care. Specifically, Preston alleges that Dr. O'Brien delayed diagnosing and treating his orbital fracture. Dr. O'Brien moves for summary judgment.[1]

**I. Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l–Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). In determining the existence of a genuine issue of material fact, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

---

[1] Mr. Preston filed a belated response to the motion for summary judgment in the form of a "motion for supporting facts." The "motion for supporting facts" [dkt 34] is **granted** to the extent that the Court will consider it as Preston's response to the motion for summary judgment. The defendant's motion to strike [dkt 35] is **denied**.

(1986). However, neither the "mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts will defeat a motion for summary judgment." *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000) (internal quotes omitted). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price,* 615 F.3d 877, 881 (7th Cir. 2010).

## II. Undisputed Facts

The following statement of facts is assessed consistent with the standard set forth above. That is, as the summary judgment standard requires, the undisputed facts are presented in the light most favorable to Preston as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). Facts relevant to each of Mr. Preston's allegations of deliberate indifference and malpractice are discussed together.

A. *Mr. Preston's Injury and Initial Treatment*

On September 12, 2010, while he was an inmate at Putnamville, Mr. Preston was hit in the face by another offender. That day, Mr. Preston was taken to the medical unit, where Charlotte Dean, LPN, assessed two lacerations on his right eye and a scratch on the side of his nose and under his nose. Exhibit C to Defendant's Motion for Summary Judgment, *Medical Records of Corey Preston* ("Exhibit C"), at 1. Nurse Dean applied steri-strips to Mr. Preston's eye and gave him aspirin. *Id.* She did not note any other injuries. *Id.* Mr. Preston submitted a Request for Healthcare on September 16, 2010, reporting that he needed to see the doctor for his right eye and he had dizziness and headaches and his face was swollen. *Id.* at 2. Mr. Preston submitted two Requests for

Health Care on September 19, 2010, stating that he saw the nurse on September 12 and was supposed to see the doctor but he had not yet. *Id.* at 3-4. He complained of significant swelling under his eye and that his nose was numb. *Id.* Nursing staff responded to his Requests on September 21, 2010 and informed Mr. Preston that he was scheduled for an x-ray and advised him to take Ibuprofen as needed and use ice for discomfort. *Id.* at 4. On September 21, 2010, Preston saw Cynthia Moore-Sivert, L.P.N. for right eye swelling. *Id.* at 5-8. Mr. Preston said that he could see fine except from the right side of his right eye and that he had pain all over his head. *Id.* Nurse Moore-Sivert noted that the right eye was swollen completely around and was completely blood shot. She took Preston's vital signs and contacted Dr. O'Brien and Dr. O'Brien ordered an x-ray. This was the first time Dr. O'Brien was aware of Preston's injuries. Exhibit B to Defendant's Motion for Summary Judgment, *Affidavit of Dr. O'Brien* ("Exhibit B"), para. 4.

On September 22, 2010, Mr. Preston submitted a Request for Healthcare reporting that he was in behavioral segregation and did not want to miss his appointment for his x-ray. Exhibit C at 10. He also reported pain in his right eye and numbness in his face. He also submitted another Request for Healthcare that day stating that he was spitting up blood and requesting his x-ray. *Id.* at 11. Mr. Preston received the x-ray. Dr. O'Brien examined Mr. Preston for the first time on September 23, 2010. *Id.* at 12-21.

B. *Treatment for Pain*

During his September 23, 2010 exam, Dr. O'Brien prescribed Mr. Preston Vicodin for 10 days for pain and submitted a consultation request for a CT scan. *Id.* at 16. Mr. Preston was seen in the Chronic Care Clinic on September 25, 2010 by Dr. Person for his chronic health conditions. *Id.*

3

at 22-23. On September 26, 2010, Dr. O'Brien renewed Mr. Preston's Vicodin for 10 days.[2] *Id.* at 24-29. In his Request for Healthcare submitted on September 28, 2010, Mr. Preston reported pain in his eye and nose and numbness. *Id.* at 31. Mr. Preston had an appointment with Dr. O'Brien on September 29, 2010, but the appointment was cancelled because Dr. O'Brien was ill. *Id.* at 32. On September 30, 2010, Dr. O'Brien examined Mr. Preston and noted that the fracture was stable. *Id.* at 33-35. Dr. O'Brien thought that Mr. Preston was doing well, with no double vision or pain over his sinuses. *Id*. His eye movement was also intact and symmetrical. *Id.*

Mr. Preston submitted a Request for Healthcare on October 1, 2010 stating that he wanted to take the Vicodin that Dr. O'Brien ordered because he was in pain. *Id.* at 39. The Request for Health Care states: "Dr. O'Brien have order pain medication for me for am and pm. The order is Vicodin 500. I wish to take my medication!" *Id.* Medical staff responded to the Request on October 3, 2010 and notified Mr. Preston that his Vicodin was discontinued. *Id.* Mr. Preston submitted a Request for Healthcare on October 4, 2010 stating that he had pain and numbness. *Id.* at 41. On October 6, 2010, Dr. O'Brien prescribed Vicodin again for 10 days. *Id.* at 43-44 and 46-48. Medical staff responded to Mr. Preston's Request on October 6, 2010 and informed Mr. Preston that medication had been ordered. *Id.* at 41.

On October 17, 2010, Mr. Preston submitted a Request for Healthcare that he was in pain and his pain medication expired. *Id.* at 51. In response, medical staff sent his Request to the doctor. *Id.* Mr. Preston was seen in nursing sick call on October 19, 2010. *Id.* at 52-54. Mr. Preston reported pain in his head and headaches. *Id.* The nurse took his vital signs and noted some swelling in the

---

[2] The medical records identify this as "resubmit of deleted approved . . . for Vicodin . . . dates 9/23-10/3/10" but do not explain why the original approval was deleted. *Id.* at 27. There is no evidence that Dr. O'Brien caused the deletion or delayed in resubmitting the prescription.

4

right eye area. *Id.* The nurse noted that she would request that Dr. O'Brien see Mr. Preston to discuss pain medication. *Id.* Mr. Preston had a CT scan on October 22, 2010 at the Plainfield Correctional Facility. *Id.* at 55-58. Mr. Preston submitted a Request for Healthcare on October 26, 2010 requesting the results of his CT scan and stating that still had discomfort on the right side of his face. *Id.* at 59. In response two days later, he was informed that he was scheduled that day to see Dr. O'Brien. *Id.* Dr. O'Brien examined Mr. Preston on October 28, 2010 and discussed with him his CT scan report, which came in that day. *Id.* at 60-70. Dr. O'Brien noted some tenderness to the lateral orbit of the right eye and some mild swelling around the nose. *Id.* He also prescribed Vicodin for 30 days. *Id.*

Dr. O'Brien saw Mr. Preston again on November 1, 2010 and noted that he was doing well with pain medication and had no visual changes or double vision. *Id.* at 72-73. Mr. Preston submitted a Request for Healthcare on November 2, 2010 asking if he had been scheduled to see a plastic surgeon and that he had pain and blurred vision. *Id.* at 74. In response, he was informed that his Vicodin prescription was renewed through November 28, 2010. *Id.* On November 3, 2010, Mr. Preston submitted a Request for Healthcare complaining of pain, numbness, headaches, and blurred vision. *Id.* at 76. On November 8, 2010, Mr. Preston submitted a Request for Healthcare against stating that he had blurred vision, numbness, and discomfort when he chewed. *Id.* at 78.

On November 10, 2010, Mr. Preston was scheduled for a nursing sick call visit in response to his November 8, 2010 Request for Healthcare, but Mr. Preston opted not to see the nurse. *Id.* at 81. On November 12, 2010, Mr. Preston submitted three Requests for Health Care. *Id.* at 82-84. In the first Request, he asked about certain entries in his chart from Dr. O'Brien on November 2, 2010 because he did not see Dr. O'Brien on that date. *Id.* at 84. Medical staff responded to the Request the next day and informed Mr. Preston that Wishard Hospital contacted the doctor to schedule his

plastic surgery appointment on November 2, 2010. *Id.* The second Request asked for medical treatment and the third Request was regarding pain in his face and headaches. *Id.* at 82-83. Mr. Preston was scheduled for nursing sick call on November 15, 2010, but the appointment could not take place because the facility was on lock-down. *Id.* at 76. Mr. Preston submitted a Request for Healthcare on November 20, 2010 regarding headaches, blurred vision and pain in his face. *Id.* at 85. Mr. Preston was seen in nursing sick call on November 22, 2010 for complaints of vision changes. *Id.* at *85-88.* The nurse took Mr. Preston's vital signs and tested his visual acuity. *Id*. His eye exam was within normal limits, but the nurse referred Mr. Preston for an eye exam with the eye doctor due to his injury. *Id*.

On November 24, 2010, Mr. Preston submitted a Request for Health Care stating that his Vicodin was about to run out. *Id.* at 89. In response, medical staff said they would ask the doctor. *Id*. Mr. Preston submitted another Request for Healthcare on November 30, 2010 that he was being denied medication for his pain. *Id.* at 90. He wanted to see the doctor and the eye doctor. *Id*. Medical staff responded to this Request three days later and informed Mr. Preston that the eye doctor only came to the prison twice a month and that he was scheduled for the next time that the eye doctor was at the prison. *Id*. Mr. Preston was also informed that he was scheduled to see Dr. O'Brien. *Id*.

On December 3, 2010, Mr. Preston submitted a Request for Health Care stating that he had been trying to see the doctor for pain in his face and blurry vision, headaches, night sweats and dizziness. *Id.* at 92. Mr. Preston was scheduled for nursing sick call on December 6, 2010, but the appointment could not be completed because the facility was on lock-down. *Id*. at 76. Mr. Preston had an appointment to see medical staff on December 7, 2010. *Id*. at 92, 94, and 96. However, Mr. Preston refused the appointment because it was too cold, and he refused to sign the refusal form, which was witnessed by two people. *Id*. Mr. Preston then submitted a Request for Health Care on

6

December 7, 2010 stating that he was supposed to go to medical that day and officers escorted him out into the cold without a coat and a hat and that he was not refusing medical treatment but he was refusing to go outside without a coat and a hat. *Id*. at 95. In response, he was told he was scheduled to see the doctor on December 9, 2010. *Id*.

Mr. Preston had an appointment to see Dr. O'Brien on December 9, 2010, but there was no custody staff available to escort Mr. Preston to the appointment. *Id.* at 98. The appointment therefore had to be rescheduled. *Id*. On December 10, 2010, Mr. Preston submitted a Request for Health Care stating that he had been trying to see the doctor for his facial problems. *Id.* at 99. Medical staff responded that he was scheduled to see the doctor. *Id.* at 76 and 99. Mr. Preston had an appointment with Dr. O'Brien on December 13, 2010, but the appointment had to be rescheduled because there was no custody staff available to escort Mr. Preston to the appointment. *Id.* at 100.

On December 28, 2010, Mr. Preston had an exam with the optometrist, Dr. Aaron Cunningham, and received a prescription for reading glasses. *Id.* at 76 and 101-102. On January 4, 2011, Dr. O'Brien examined Mr. Preston and discussed treatment options with him. *Id.* at 103-104; Exhibit B para 10. Dr. O'Brien noted that Mr. Preston had a stable orbital fracture and that surgery was not indicated. Exhibit C. at 103-04. Mr. Preston had pain under the right eye, but good ocular motion. *Id*. He denied changes in vision or changes in smell. *Id*. Dr. O'Brien prescribed Naprosyn for discomfort. *Id*.

On May 22, 2011, Mr. Preston reported pain on the right side of his face and blurred vision. *Id.* at 105. In response, he was scheduled to see the doctor. *Id*. Mr. Preston was seen in Chronic Care Clinic on August 4, 2011 by Dr. Michael Person, but he did not report any problems with his face or vision during that appointment. *Id.* at 106-07. Mr. Preston had another Chronic Care Clinic

7

appointment on October 31, 2011 with Dr. Haynes. *Id*. at 108-09. He did not mention any issues with his face at that appointment. *Id*.

Mr. Preston received his own supply of Naprosyn that he kept on his person from January 4, 2011 to July 21, 2011. *Id.* at 113-15. Dr. O'Brien left his position at Putnamville on November 24, 2011 and he had no further involvement with Mr. Preston after that time. Exhibit B, para. 12.

C. *The CT Scan*

On initial exam on September 23, 2010, Dr. O'Brien noted that Mr. Preston was assaulted by another inmate and was struck in the right eye. *Id.* Dr. O'Brien's physical exam was negative for vision loss, diplopia and open laceration. *Id.* Because of Mr. Preston's x-ray results, which showed that Mr. Preston had a fracture of the right orbit, Dr. O'Brien submitted a consultation request for a CT scan of the facial bones at the Plainfield Correctional Facility Radiology Department. *Id.* Dr. O'Brien believed that sending Mr. Preston to the Plainfield Correctional Facility for his CT scan would be faster than referring him to an outside hospital for testing. Exhibit B, para 5.

On September 27, 2010, Darla Scherb, the scheduling assistant, scheduled Mr. Preston's CT scan at the Plainfield Correctional Facility. Exhibit C at 30. However, the initial appointment for a CT scan did not occur because the mobile imaging company could not come to the prison on the scheduled day.[3] Exhibit B, para 6. The appointment was rescheduled. Mr. Preston submitted a

---

[3] Based on his filings, Mr. Preston appears to believe that the CT scan was denied by Dr. O'Brien, but this conclusion is not supported by the record. He bases his conclusion in part on a grievance response stating "Mr. Harris, Health Care Administrator reports that a Consultation Request has been submitted, approved, and scheduled for a CT scan to be completed of your face. . . ." (*See* Attachment to Mr. Preston's Motion for Supporting Facts). But this statement does not necessarily imply that Harris is the one who approved the CT scan. It is simply a report based on Harris's understanding of the situation. Preston also says that on September 30, 2010, Dr. O'Brien denied the CT scan and refused to treat his pain. But the medical records show that the initial appointment for a CT scan did not occur because the mobile imaging company could not come to the prison on the scheduled day. Further, Mr. Preston signed a consent

Request for Healthcare on September 28, 2010 asking to see another doctor and for his CT scan. Exhibit C at 31. Because the CT scan was delayed, Dr. O'Brien ordered another set of x-rays to confirm that the fractures were stable. Exhibit B, para. 6; Exhibit C at 33-35. That x-ray was performed on September 30, 2010. Exhibit C at 36. The x-rays showed a possible blow out fracture of the right orbit; follow up by CT scan of the facial bones was strongly recommended. *Id.* at 36.

Mr. Preston submitted a Request for Healthcare on October 4, 2010 that he had pain and numbness. *Id.* at 41. Medical staff responded to the Request and informed Mr. Preston that medication had been ordered. *Id.* The response also stated "CT scan has been denied at this time." On October 6, 2010, Mr. Preston also signed a consent form for his CT scan that was scheduled. *Id.* at 45. On October 13, 2010, Mr. Preston submitted a Request for Healthcare asking when he would be going for his CT scan. *Id.* at 50. In response, he was informed that he could not be told of the appointment date due to security rules. *Id.*

Mr. Preston had a CT scan of his face on October 22, 2010. Exhibit C at 55-58. Mr. Preston submitted a Request for Healthcare on October 26, 2010 that he wanted the results of his CT scan and still had discomfort on the right side of his face. *Id*. at 59. Dr. O'Brien examined Mr. Preston on October 28, 2010 and discussed with him his CT scan report, which came in that day. *Id.* at 60-70. Dr. O'Brien noted some tenderness to the lateral orbit of the right eye and some mild swelling around the nose. *Id.* He submitted a consultation request to send Mr. Preston to a plastic surgeon for evaluation of his fractures. *Id.*

---

form for CT scan on October 6, 2010 and in response to his October 13, 2010 Request for Health Care asking "when will I go for my CT scan?," he was told "you are scheduled soon."

D. *Treatment by the Plastic Surgeon*

When Dr. O'Brien examined Mr. Preston on October 28, 2010, he discussed with him his CT scan report, which came in that day. He also submitted a consultation request to send Mr. Preston to a plastic surgeon for evaluation of his fractures. Mr. Preston submitted a Request for Healthcare on November 2, 2010 asking if he had been scheduled to see a plastic surgeon and that he had pain and blurred vision. *Id.* at 74. In response, he was informed that his Vicodin was renewed through November 28, 2010. *Id.* Also on November 2, 2010, someone from Wishard Hospital called Dr. O'Brien to schedule Mr. Preston's plastic surgery appointment. Exhibit B, para. 8.

When Dr. O'Brien referred a patient to an outside hospital or specialist, Dr. O'Brien had no control over when that hospital or specialist scheduled the patient. *Id.* When an offender was scheduled for an appointment outside of the prison, medical staff could not inform the offender of the date and time of the appointment pursuant to Department of Correction security policies. *Id.* On November 4, 2010, scheduling assistant Darla Scherb noted that she scheduled Mr. Preston for an urgent appointment with plastic surgery at Wishard Hospital. Exhibit C at 77. Mr. Preston went to Wishard Hospital on November 8, 2010, and saw the plastic surgery team. *Id.* at 79; Exhibit E to Defendant's Motion for Summary Judgment, *Wishard Hospital Medical Records*, at 1-2. On exam, Mr. Preston had some callous formation and tenderness, but normal sensation and he was able to move his eyes freely in all directions and had no evidence of entrapment. *Id.* at 2. The plastic surgeon determined that surgery was not indicated and recommended that Mr. Preston return in approximately 6 months for a follow-up exam. *Id.* The record also states:

> most likely no surgical intervention would have been required for any of the fractures other than the right orbital floor fracture. I explained to him that though he does not have any evidence of enophthalmos currently, he may develop that over the ensuing months, at which point in time surgical intervention may become necessary. Therefore we plan on seeing him back in six months' time to see for the

10

> possibility of development of enophthalmos and if that occurs then possible surgical intervention would be planned

*Id.*

On November 30, 2010, Mr. Preston submitted a Request for Health Care stating that he saw the plastic surgeon on November 8, 2010 and he claimed the plastic surgeon would not fix his face and he wanted to know who would. Exhibit C at 91. The plastic surgeon had recommended that Mr. Preston return in 6 months, or approximately May, 2011. Exhibit B, para. 10. However, it was Dr. O'Brien's opinion that it was not medically necessary to send Mr. Preston back to Wishard Hospital because he had no complaints regarding his face and no deformity at the fracture site. *Id*.

### III. Discussion

Mr. Preston asserts the following claims against Dr. O'Brien: (1) a claim pursuant to 42 U.S.C. § 1983 that Dr. O'Brien was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution and (2) a state law claim for medical malpractice.

A. *Deliberate Indifference*

Dr. O'Brien moves for summary judgment on Mr. Preston's § 1983 claim arguing that he was not deliberately indifferent to Preston's serious medical needs. A claim of deliberate indifference "must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." *Arnett v. Webster,* 658 F.3d 742, 750 (7th Cir. 2011). A medical condition is objectively serious if "a reasonable doctor or patient" would deem the condition "important and worthy of comment or treatment." *Hayes v. Snyder*, 546 F.3d 516, 523–24 (7th Cir. 2008) (quotation omitted). Deliberate indifference to the serious medical need exists only when an official "knows of and disregards an excessive risk to an inmate's health;

11

the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Deliberate indifference "is more than negligence and approaches intentional wrongdoing." *Arnett*, 658 F.3d at 751 (citing *Collignon v. Milwaukee Cnty.,* 163 F.3d 982, 988 (7th Cir. 1998)). A plaintiff can show that a medical professional disregarded his serious medical need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." *Arnett*, 658 F.3d at 751. A court examines the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999).

Here, Dr. O'Brien does not dispute for purposes of summary judgment that Mr. Preston's fracture constituted a serious medical need. He argues, however, that he was not deliberately indifferent to that need. Mr. Preston alleges that Dr. O'Brien was deliberately indifferent to his serious medical needs in four different ways, each of which will be discussed in turn.

      1. <u>Delay in initial treatment</u>

First, Mr. Preston asserts that Dr. O'Brien unreasonably delayed in initially treating his facial fracture. It is undisputed, however, that Dr. O'Brien was not aware of Preston's injury until September 21, 2010, 9 days after the injury. Exhibit B, para. 4. When he became aware of the injuries, he ordered an x-ray and examined him two days later, on September 23, 2010. *Id.* paras. 4 and 5. Because Dr. O'Brien was not aware of Mr. Preston's injuries until September 21, 2010, he cannot be found to be deliberately indifferent for any delay in treatment that occurred before that date. On that date, Dr. O'Brien ordered x-rays for Mr. Preston and he examined Mr. Preston two days later. This is not a significant enough delay to constitute deliberate indifference.

2. <u>Denial of pain medication</u>

Mr. Preston also alleges that Dr. O'Brien was deliberately indifferent to his pain. Dr. O'Brien treated Mr. Preston's pain nearly continuously from the time he became aware of Mr. Preston's injuries. Every time Dr. O'Brien examined Mr. Preston, Mr. Preston had or received a prescription for pain medication. For example, Dr. O'Brien prescribed Mr. Preston Vicodin for 10 days when he first examined him on September 23, 2010. Dr. O'Brien also submitted a consultation request for a CT scan at this time. He resubmitted the Vicodin prescription on September 26, 2010. To the extent that Mr. Preston asserts that Dr. O'Brien denied him pain medication, Mr. Preston has not created a genuine issue of material fact because this assertion is belied by the record. In fact, Mr. Preston's medical records show that he submitted a Request for Healthcare on October 1, 2010 that he wanted to take the Vicodin that Dr. O'Brien had ordered. Medical staff responded to the Request on October 3, 2010 and notified Mr. Preston that his Vicodin was discontinued. The reason for this appears to be that the original prescription was for only September 23 through October 3, 2010. Mr. Preston submitted a Request for Healthcare on October 4, 2010 that he had pain and numbness. On October 6, 2010, Dr. O'Brien again prescribed Mr. Preston Vicodin for 10 days.

On October 17, 2010, Mr. Preston submitted a Request for Healthcare stating that he was in pain and his pain medication expired. In response, medical staff sent his Request to the doctor. Mr. Preston was seen in nursing sick call on October 19, 2010. Mr. Preston reported pain in his head and headaches. Dr. O'Brien examined Mr. Preston on October 28, 2010 and renewed his Vicodin prescription for 30 days. While there is a gap in Mr. O'Brien's pain medication between October 16, 2010 and October 28, 2010, there is no evidence that this gap was caused by misconduct on Dr. O'Brien's part or that Dr. O'Brien consciously ignored Mr. Preston's requests for

medication. Dr. O'Brien did not examine Mr. Preston during that time period and deny him medication and there is no record that Dr. O'Brien otherwise affirmatively denied Mr. Preston's need for medication. And when Dr. O'Brien did examine Mr. Preston on October 28, 2010, he again refilled Mr. Preston's Vicodin prescription.

There was also a significant gap in Mr. Preston's pain medication between November 24, 2010 and January 4, 2010. On November 24, 2010, Mr. Preston submitted a Request for Health Care stating that his Vicodin was about to run out. He submitted a further request on November 30, 2010 stating that he had been denied medication for his pain. He was informed that he was scheduled to see Dr. O'Brien. Mr. Preston's appointment with Dr. O'Brien was unfortunately delayed a number of times in December of 2010 because of the unavailability of a custody staff to escort him. When Mr. Preston did see Dr. O'Brien, on January 4, 2011, he prescribed Naprosyn for pain. Mr. Preston received Naprosyn for 6 months.

Deliberate indifference requires a finding that a medical professional "intentionally disregarded the known risk to inmate health or safety." *Collins v. Seeman,* 462 F.3d 757, 762 (7th Cir. 2006). In other words, "[t]he official[] must know of and disregard an excessive risk to inmate health; indeed, they must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'" *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir.2005) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). While there were significant delays in the treatment of Mr. Preston's pain, there is no evidence that Dr. O'Brien was aware of or contributed to these delays. When Dr. O'Brien did examine Mr. Preston, he noted his pain and prescribed medication for it. In these circumstances, the Court cannot find that Dr. O'Brien was deliberately indifferent to Mr. Preston's pain.

14

3. Delay of CT scan

Mr. Preston also asserts that Dr. O'Brien exhibited deliberate indifference by denying him a CT scan. Dr. O'Brien first referred Mr. Preston for a CT scan when he saw him on September 23, 2010. At that time, Dr. O'Brien referred Mr. Preston to another prison where a mobile imaging company could do the CT scan, which he thought would be faster. However, the initial appointment for a CT scan did not occur because the mobile imaging company could not come to the prison on the scheduled day. The appointment was therefore rescheduled. It was beyond Dr. O'Brien's control that the mobile imaging company had to reschedule the appointment. In the interim, because of the delay, Dr. O'Brien ordered another set of x-rays to confirm that Mr. Preston's fractures were stable. On September 30, 2010, Dr. O'Brien examined Mr. Preston and noted that the fracture was stable. Dr. O'Brien thought that Mr. Preston was doing well, with no double vision or pain over his sinuses. His eye movement was also intact and symmetrical. Because Mr. Preston's CT scan had to be rescheduled, Dr. O'Brien ordered repeat x-rays and a re-evaluation in two weeks. Mr. Preston had additional x-rays on the same day, which showed possible blow out fracture of the right orbit. Follow-up by CT scan of the facial bones was strongly recommended. Dr. O'Brien ordered the CT scan, but had no control over when the scan would be scheduled. Mr. Preston had a CT scan on October 22, 2010 at the Plainfield Correctional Facility.

There can be no doubt that there was significant delay in Mr. Preston receiving a CT scan. But there is no evidence that Dr. O'Brien caused or contributed to this delay. He had no control over the mobile imaging unit or the scheduling of the scan. When the scan could not be completed as initially scheduled, Dr. O'Brien ordered repeat x-rays and a follow-up exam to monitor Mr. Preston's fracture. To the extent that the medical records reflect one instance of denial of the scan, they also reflect that Mr. Preston signed a release for a scheduled CT scan that same day. Further,

there is no indication in the records that Dr. O'Brien ever denied Mr. Preston a CT scan. In short, Dr. O'Brien was not deliberately indifferent to Mr. Preston's need for a CT scan.

### 4. Denial of follow-up visit with plastic surgeon

Finally, Mr. Preston challenges the fact that the plastic surgeon recommended that Mr. Preston return for a follow-up visit in 6 months, but Dr. O'Brien did not order a follow-up. Dr. O'Brien did not feel a return visit was medically necessary based on his examination of Mr. Preston and conclusion that Mr. Preston had no complaints regarding his face and no deformity at the fracture site.

A doctor is deliberately indifferent when "no minimally competent professional would have so responded under the circumstances." *Arnett*, 658 F.3d at 751. Because Dr. O'Brien based his decision not to have Mr. Preston follow up with the plastic surgeon on his exam and findings regarding the healing of Mr. Preston's facial fracture, there is no evidence to support such a conclusion here. In other words, Dr. O'Brien was not deliberately indifferent for failing to have Mr. Preston follow-up with a plastic surgeon.

### B. *Medical Malpractice*

Mr. Preston also makes a claim for medical malpractice under Indiana state law.[4] The Indiana Medical Malpractice Act provides that a lawsuit cannot be brought against a qualified healthcare provider before the claimant's proposed complaint has been presented to a medical review panel established under Indiana Code section 34-18-10 and an opinion is given by the panel.

---

[4] "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). But where "an interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case." *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997). Because that is the case here, the Court will maintain jurisdiction over Mr. Preston's state law claim.

*See* Ind. Code § 34-18-8-4. While Dr. O'Brien treated Mr. Preston during the relevant time period, Dr. O'Brien was a "qualified healthcare provider" under the Indiana Medical Malpractice Act. Exhibit D to Defendant's Motion for Summary Judgment, *Affidavit of Nancy Wilkins*, paras. 5-7. Mr. Preston has not filed a proposed complaint with the Indiana Department of Insurance. *Id.* Because it is undisputed that Dr. O'Brien is a qualified healthcare provider under this statute and Mr. Preston has not filed a proposed complaint against Dr. O'Brien with the Indiana Department of Insurance, his medical malpractice claim must be dismissed.

## IV. Conclusion

The defendant's motion for summary judgment [dkt 20] is **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 9/26/14

*(signature)*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution:

Corey Preston, #871340
410 G Birchtree Lane
Fort Wayne, IN 46807

Electronically registered counsel